AES/DCP:MEB
F. #2019R01465

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against –

GONZALO GUZMAN MANZANILLA,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. 21-260 (ENV)
(T. 18, U.S.C., §§ 982(a)(1), 982(b)(1),
1956(h) and 3551 et seq.; T. 21, U.S.C.,
§ 853(p))

THE UNITED STATES CHARGES:

### INTRODUCTION

At all times relevant to this Information, unless otherwise stated:

I.    The Defendant and Relevant Individuals and Entities

        1.    Petróleos Mexicanos ("PEMEX") was the state-owned oil company of Mexico. PEMEX and its wholly-owned subsidiaries were owned and controlled by the government of Mexico and performed functions that Mexico treated as its own. PEMEX and its wholly-owned subsidiaries were "instrumentalities" of a foreign government, and the officers and employees of PEMEX and its wholly-owned subsidiaries were "foreign officials," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

        2.    PEMEX Procurement International, Inc. ("PPI") was a wholly-owned and controlled subsidiary company of PEMEX, headquartered in the United States, that provided procurement services to PEMEX and certain of its subsidiaries. PPI was an "instrumentality" of

2

a foreign government, and PPI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

3. The defendant GONZALO GUZMAN MANZANILLA ("GUZMAN"), was a citizen of Mexico and a resident of Houston, Texas. GUZMAN worked at PPI from in or about and between 1999 and 2020. In or about and between 2016 and 2020, GUZMAN was a procurement general manager at PPI. GUZMAN was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

4. Vitol Inc. ("Vitol") was the U.S. subsidiary of a European energy trading company whose principal place of business was in Houston, Texas. Vitol was part of the Vitol group ("Vitol Group") of companies. Vitol was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5. Vitol Trader, an individual whose identity is known to the United States, was a citizen of Mexico and a resident of Houston, Texas. At all relevant times, Vitol Trader was an oil and commodities trader at Vitol Inc. Vitol Trader was a "domestic concern" and an employee and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6. PPI Official ("PPI Official"), an individual whose identity is known to the United States, was a citizen of Mexico and, beginning in or about 2013, a resident of Houston, Texas. PPI Official worked at PPI from in or about and between 2006 and 2019. In or about and between 2017 and 2019, PPI Official was a procurement general manager at PPI. PPI Official

3

was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2).

7. Intermediary #1, an individual whose identity is known to the United States, was a citizen of Mexico. Intermediary #1 owned or controlled several companies and bank accounts that were used to facilitate the payment of bribes to Mexican officials on behalf of Vitol.

8. Intermediary #2, an individual whose identity is known to the United States, was a citizen of Curaçao. Intermediary #2 owned and maintained several shell companies and bank accounts that were used to facilitate the payment of bribes to Mexican officials and other government officials on behalf of Vitol.

II.  The Bribery and Money Laundering Scheme

9. Beginning in or about August 2017, Vitol Trader offered, promised, and authorized the payment of bribes to the defendant GONZALO GUZMAN MANZANILLA and PPI Official, and GUZMAN and PPI Official agreed to accept, and accepted, such bribes, in exchange for GUZMAN and PPI Official providing improper advantages to assist Vitol Trader, Vitol and others to obtain and retain business with PPI and others.

10. To promote the bribery scheme and conceal the proceeds of the bribery scheme, payments to the defendant GONZALO GUZMAN MANZANILLA, PPI Official and others were paid through offshore bank accounts held by shell companies controlled by Intermediary #1 and Intermediary #2. Vitol Trader, Intermediary #1, Intermediary #2 and others also created, and caused to be created, false invoices and contracts to falsely justify and further conceal the proceeds of the illegal bribery scheme.

4

12. In furtherance of the scheme, in or about August 2017, the defendant GONZALO GUZMAN MANZANILLA and PPI Official met with Vitol Trader in Houston, Texas. At the meeting, Vitol Trader agreed to pay bribes to GUZMAN and PPI Official for confidential, inside information that GUZMAN and PPI Official would provide to assist Vitol in winning business from PPI, including a valuable contract to supply ethane to PPI (the "Ethane Supply Contract"). This agreement to pay bribes was also discussed in subsequent meetings between GUZMAN, PPI Official and Vitol Trader that took place in Houston, Texas in or about and between August 2017 and April 2018.

13. Specifically, in or about between August 2017 and April 2018, during meetings in Houston, Texas, Vitol Trader corruptly agreed to make payments to the defendant GONZALO GUZMAN MANZANILLA and PPI Official totaling approximately $600,000 if Vitol ultimately won the Ethane Supply Contract. GUZMAN and PPI Official agreed that they would split evenly any bribe money received from Vitol Trader and Vitol.

14. In or about June 2018, Vitol was awarded the Ethane Supply Contract.

15. To conceal proceeds of the bribery scheme and to promote the bribery scheme, the co-conspirators caused the bribes payments to the defendant GONZALO GUZMAN MANZANILLA and PPI Official to be paid through a series of transactions designed to conceal the purpose of the payments. Bribe payments were first sent from Vitol Group bank accounts to bank accounts controlled by Intermediary #2 in Curaçao. The payments were then transferred from the bank accounts controlled by Intermediary #2 in Curaçao to bank accounts controlled by Intermediary #1 in Mexico. Finally, the payments were transferred from the bank accounts controlled by Intermediary #1 in Mexico to bank accounts in the United States for the benefit of

GUZMAN and PPI Official.  Some of the payments were delivered to GUZMAN in cash by Intermediary #1 in the United States.

16. To further disguise the bribe payments and the proceeds of the illegal bribery scheme, Intermediary #1 and Intermediary #2 utilized sham consulting agreements between companies they controlled.  To initiate the bribe payments, Intermediary #1, through Vitol Trader and others, sent fake invoices to Intermediary #2.  Intermediary #2 then paid Intermediary #1 pursuant to the fake invoices.  As agreed by the defendant GONZALO GUZMAN MANZANILLA, PPI Official and Intermediary #1, Intermediary #1 retained approximately 12 percent of the money Intermediary #1 received from Intermediary #2, and Intermediary #1 wired the rest of the money to bank accounts controlled by GUZMAN and PPI Official, respectively, or delivered payments in cash.

17. The defendant GONZALO GUZMAN MANZANILLA received bribe payments in at least three ways: (1) payments were wired to bank accounts in the United States controlled by GUZMAN or a close relative; (2) payments were made in cash to GUZMAN in United States dollars or Mexican pesos; and (3) payments were wired to bank accounts in Mexico controlled by relatives of GUZMAN.  Several of the wire payments passed through the Eastern District of New York.   In total, in or about and between October 2017 and January 2020, Vitol Trader and others caused bribe payments totaling approximately $371,466 to be paid to GUZMAN or his close relatives.

CONSPIRACY TO COMMIT MONEY LAUNDERING

18. The allegations contained in paragraphs one through 17 are realleged and incorporated as if fully set forth in this paragraph.

19. In or about and between August 2017 and July 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant GONZALO GUZMAN MANZANILLA, together with others, did knowingly and intentionally conspire to commit offenses under Title 18, United States Code, Section 1956, to wit:

(a) to transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (ii) offenses against a foreign nation involving bribery of a public official, in violation of the Mexican Penal Code, pursuant to Title 18, United States Code, Section 1956(c)(7)(B)(iv) (collectively, the "Specified Unlawful Activities"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

(b) to transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the

proceeds of one or more specified unlawful activities, to wit: the Specified Unlawful Activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

20. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

21. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

*MARK J. LESKO*
MARK J. LESKO
Acting United States Attorney
Eastern District of New York

*Daniel S. Kahn*
DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, Dept. of Justice

*Deborah Connor*
DEBORAH L. CONNOR
Chief, Money Laundering and Asset Recovery Section
Criminal Division, Dept. of Justice